ORDER

Justice VILES.
This matter came on for hearing on the 1st of November, 1996, with Dena Walk-ingstick being represented by Todd Hem-bree and the Cherokee Nation Bingo Outpost, Inc. (now Cherokee Nation Enterprises) being represented by James Wilcoxen.
Dena Walkingstick had been an assistant gaming manager in the pulltab section of the Catoosa Bingo Outpost. She had been placed on probation after some 6-8 exit interviews had mentioned “difficulties with management” as the employee’s reason for quitting. (1) Some of the exit interviews specified Ms. Walkingstick as the member of management involved, some did not, but all of the exit interviews in question were in her file.
Shortly after this probation, there was an incident involving her alleged failure to sell pulltabs to a specific customer, Mrs. Rosie Washington, while retaining those same pulltabs for sale to another customer, Connie Swank. There w’as testimony which indicated that Ms. Swank had played a great many of the pulltabs in this particular set and wanted to play the rest of them, knowing that some substantial winning pulltabs remained in the set. It is likely that Mrs. Washington desired to purchase those same pulltabs for that very reason. There was testimony that favoritism of this type violated Cherokee gaming rules and national Indian Gaming Commission rules.
Ms. Walkingstick denied this favoritism, but the investigation performed by Management disclosed that at least two of her coworkers witnessed the favoritism and it was additionally confirmed by Connie Swank. Mrs. Washington, and her Daugh *2 ter, Antonia Washington. They did not testify in this ease, however.
The basis given to Ms. Walkingstick for her termination was violation of “Policy & Procedures” Rule 3.04 which talks of selling pulltabs after hours [1]. Rule 3.04 is vaguely written and the (2) testimony was that the “hours” were difficult to ascertain since, while the opening hour was specified, the closing hour depended (1) on the finish of the bingo games and (2) the announcement of “last cash call.” This announcement is designed to allow the cash to be counted and verified and is also designed to force pulltab players to buy their final pulltabs of the evening. (They can still purchase more pulltabs with winning pulltabs, but are not supposed to be able to buy any more pulltabs.)
It is unclear whether or not “last cash call” was itself the deadline for purchase or whether or not players could purchase more pulltabs, as long as they immediately moved to do so. The policy at that time was apparently to take whatever money customers were later willing to offer and this may have resulted in sales well after “last cash call.”
In any event, the testimony was that Ms. Walkingstick was terminated for three reasons: she had 6-8 exit interview complaints, she sold pulltabs after “last cash call,” and then sold those pulltabs only to one customer while denying sales to another customer.
After examining all of the documentary evidence and listening to the witnesses, WE FIND THAT THE EMPLOYMENT OF MS. WALKINGSTICK WAS TERMINATED WITH CAUSE. The manuals could have been better written (and hopefully are now), the grounds of termination should have been better stated, employee indoctrination and education could have been better done and better documented, but our judgment is for Respondent. We feel that there were ample grounds for (3) termination under the Outpost’s Employee Information Manual, Code of Conduct, found on p. 14. This document was introduced as Respondent’s Exhibit 2.
WE FIND THAT THE TERMINATION OF DENA WALKINGSTICK ON SEPTEMBER 28, 1995, WAS FOR CAUSE AND SHOULD BE, AND IS, UPHELD.
ALL JUSTICES CONCUR.

. The 3.04 used at trial, however, was on p. 8 of the Cherokee Nation Gaming Commission Rules of Operation, introduced as Respondent's Exhibit 1. It is unclear whether these rules were designed to apply to individual employees or only to the gaming entity. It may be that there is a Policy & Procedures document with an identical Section 3.04.